Ex parte WALLACE.

WALLACE v. BLANCHARD et al.

(No. 2452.    Feb. 24, 1920.)

(On Motion for Rehearing, May 22, 1920.)

SYLLABUS BY THE COURT.

1.   Under section 17, Code 1915, only the consent of the mother of an illegitimate child is required for its adoption. The consent of the putative father of a bastard child is not required for its adoption, nor is it essential that notice should be given to such father of the petition for adoption.    P. 186

2.   As the parents have no property right in a child, its custody may be given to others, even without the consent of the parents and without notice to them.    P. 187

3.   While the putative father of a bastard child might be entitled to its custody as against strangers, he would not be entitled to its custody as against adopting parents, upon whom rests a legal duty to support, educate, and care for such child.
    P. 187

4.   At common law a bastard was looked upon as a son of nobody, and sometimes was called "filius nullius," and sometimes "filius populi," a child of the people, having no father and being incapable of inheriting, nor could he have heirs but of his own body.    P. 191

ON MOTION FOR REHEARING.

5.   Code 1915, § 1850, as amended by Laws 1915, c. 69, entitling illegitimate to inherit, the other statutory conditions appearing, although there were legitimate children, deals only with the right of inheritance, and does not cast upon the putative father the duty to support, care for, and educate such children during their minority, or change the rights of custody as between the putative father and those claiming the custody of such children under an attempted adoption.    P. 194

6. The poor laws of England, under which the putative father was required to support his illegitimate child, did not, by the adoption of the common law, become a part of the law of the state.                                                    P. 194

Appeal from District Court, Chaves County; Bratton, Judge.

Habeas corpus by James Day Wallace, on behalf of Hazel May Wallace and Pauline Minta Wallace, minors, and James Day Wallace, against W. E. and Francis L. Blanchard, to obtain the custody of the two minors. Custody awarded to petitioner, and respondents appeal. Reversed, with instructions to set aside judgment and to restore the custody of the minors to respondents.

H. B. HAMILTON, of Carrizozo, and GIBBANY and EPSTEIN, of Roswell, for appellants.

Consent by putative father is unnecessary to adoption. 1 Jones Blue Book Evid. Sec. 93; Grates v. Garcia, 20 N. M. 162.

Mother is not competent to testify that child born in lawful wedlock was not begotten by husband. Grates v. Garcia, supra.

Mother of illegitimate child is entitled to custody of child.    Bustamente v. Analla, 1 N. M. 255. Clark v. White, 102 Ark. 93; 143 S. W., 587; Van Matre v. Sankey, 148 Ill. 536; 39 A. S. R. 196; Nugent v| Powell; 4 Wyo. 173; 33 Pac. 23; 20 L. R. A. 199;

As to contract to adopt, see, Barney v. Hutchinson, 177 Pac. (N. M.) 890; 5 Cyc. 627.

As to presumption of legitimacy, see, 2 Cyc. 136; Watts v. Owens, 62 Wis. 512; Wilson v. Babb, S. Car. 59; 2 Enc. Evid. 237; State v. Romaine, 11 N. W. 721.

"If the fact of marriage be proved, nothing can impugn the legitimacy of the issue, short of the proof of facts showing it to be impossible that the husband could be the father, Patterson v. Gaines, 6 How. (U. S.) 550." 2 Cyc. of Evid, 237-8-9-40-41; Dennison v. Page, 72 Am.

Dec. 644; and cases cited in notes; Patterson v. Gaines, U. S. Sup. Rep., 46-49, page 550; Amer. Eng. Cyc. of Law, 2 Ed. 877; And cases cited in notes; Vaughn v. Rhodes, 13 Am. Dec. 713; Cooley v. Cooley, 36 Southeastern, 563; Grates v. Garcia, 20 N. M. 158; In re McNamara Estate, 183 Pac. 552; Wright v. Hicks, 60 Am. Dec. 687.

L. O. FULLEN, of Roswell, for appellee. A. B. RENE-HAN and JAMES M. HERVEY, for appellee on motion for rehearing.

The rule is well settled that the mother of an illegitimate or bastard child has a legal right to its custody, superior to the right of the father or any other person, but there is another rule of law which is equally well settled, and that is this. That, while the legal right of the mother of a bastard is superior to that of the father, and although the right of the father to the custody of his bastard child is inferior to the right of the mother, his right is superior to the right of any other person and, on the death of the mother, he becomes entitled, as against the world, to the care and custody of the child. 3 R. C. L. Bastards, Sec. 23. Aycock v. Hampton, 65 L. R. A. 689 (Note) Appeal of Pote, 51 Am. Rep. 540. Allison v. Bryan, 18 L. R. A. (N. S.) 931. 2 Am. & Eng. Enc. of Law, 142. 7 Corpus Juris, Bastards, Sec. 29. Barela v. Roberts, 34 Tex. 554.

OPINION OF THE COURT.

ROBERTS, J. Petitioner was awarded the custody of two minor children by habeas corpus proceedings. This appeal is from final judgment therein.

The facts, briefly stated, upon which the case must be decided, are as follows:

Respondents are brothers, and in the year 1918 they were living on the same ranch in Lincoln county, this state. It is conceded by counsel for petitioner that respondents are morally and financially qualified and able

to have the care and custody of the infants herein named. In 1918, Mrs. Kaiser, a sister of petitioner, got in communication with the respondents by advertising that she had in her possession two girls, aged 10 and 12 years, for whom she desired to find a suitable home. As a result of the advertisement and subsequent correspondence, the children were delivered to respondents herein, and afterwards the respondents attempted to adopt them under the provisions of chapter 2, Code 1915, in the probate court of Lincoln county.

The children were the illegitimate children of one Effie May Searles, a married woman, now deceased, and petitioner claims to be the putative father of such children. That he is the father is conceded by respondents. Petitioner bases his right to the custody of the children upon the fact that he is the putative father; that under the statutes of New Mexico he was entitled to notice of the adoption proceedings; and that not having consented thereto, nor receiving notice of the proceeding, the order of adoption as to him was null and void.

The trial court evidently agreed with petitioner, because judgment was entered giving him the custody of the children. At the time the children were adopted the sister of petitioner, Mrs. Kaiser, informed respondents that the father of the girls was dead, and it appeared upon the hearing that at the time she delivered the girls to respondents she had not heard from her brother for about three years. He had left the children with his sister, with the agreement that she was to keep them together and return them to him when he should return home and reclaim them.

The trial court made no specific findings of fact, but generally found the issues in favor of the petitioner. We understand from the record that the moral fitness of the parties to the care and custody of the children was not considered by the trial court, and this question did not enter into the determination of the case. No opportunity was given the respondents to produce evidence as to the moral fitness of petitioner. The petitioner has re-

sided at Ft. Scott, Kan., or Kansas City, Mo., practically all his life; and while affidavits were presented to the court attached to the return, showing the moral unfitness of petitioner, these were stricken upon motion of petitioner, and the court refused to postpone the hearing until witnesses could be produced or depositions taken to prove the same facts. The court refused the postponement, we assume, upon the theory that such a question was not involved in the case, if in fact the putative father had received no notice of the proceedings. Nor do we believe that the question of abandonment influenced the determination of the question by the trial court. It is somewhat difficult to determine the exact theory upon which the case was tried in the court below because of the pleadings in the case and the failure of the court to make specific findings of fact.

In petitioner's brief, after discussing the point raised by respondents to the effect that, as the children were born in wedlock—that is, the mother Effie May Searles, had a living husband, and it was not shown that they did not have access to each other—petitioner could not bastardize the children by the assertion that he was their father, because the question was not raised in the trial court. He proceeds:

"So, going directly to the point of the right of a putative father to have the possession, control, and care of his children, and to the necessity of his consent for any proceeding against them, appellee says:

" 'The rule is well settled that the mother of an illegitimate or bastard child has a legal right to its custody, superior to the right of the father or any other person, but there is another rule of law which is equally well settled, and that is this: That while the legal right of the mother of a bastard is superior to that of the father, and although the right of the father to the custody of his bastard child is inferior to the right of the mother, his right is superior to the right of any other person, and, on the death of the mother, he becomes entitled, as against the world, to the care and custody of the child.' "

Thus we conceive the determinative question in this case to be: (a) Is the putative father of a bastard child required to consent to its adoption? and, (b) if not re-

quired to consent, is it essential that notice should be given to him of the adoption proceedings? This requires a consideration of the law of adoption and the right of a putative father to the care and custody of his children, independent of statute.

(**1**)    The adoption of children is governed by chapter 2, Code 1915, §§ 13 to 25, inclusive. Section 13 provides that any minor child may be adopted by any adult person in the cases and subject to the rules prescribed in said chapter. Section 15 requires the consent of the husband and wife if living together and the child is legitimate. Section 17 provides that an illegitimate child cannot be adopted without the consent of its mother, if known and capable of consent. Section 19 requires the filing of a petition in the probate court by the party seeking to adopt, in which he is required to set forth the facts entitling him to adopt the child, and provides for the appearance before the probate judge of the party whose consent is required, if resident within the state, and the filing with the probate judge of the consent, if the parties who are required to consent are nonresidents of the state, which consent must be acknowledged as required by the statute.

Sections 21 and 22 read as follows:

"Sec. 21.    Upon satisfactory proof that a child is abandoned and unprovided for by its parents or relatives, the probate judge shall permit such child to be adopted without the consent of its parents or relatives, upon the execution of the agreement hereinbefore required of the applicant."

"Sec. 22.    The probate judge must examine all persons appearing before him pursuant to the provisions of this chapter, and if satisfied that the interests of the child or children to be adopted will be promoted by the adoption by applicant, he must make an order declaring the child to be adopted by the applicant and thenceforth to be regarded and treated in all respects as the  child of the person adopting; or if the applicant be such an association or corporation as mentioned in this chapter, the probate judge must make an order declaring such child or children to be adopted by such association or corporation, and thenceforth such association or corporation to be considered as having the custody and control of such child or children, in place of its natural guardians."

From other sections of the statute it will be seen that it is the policy of the legislature of this state to place the supervision of children of indigent parents, or who have been abandoned, under the control of the probate courts of the various counties. For example, section 232 gives to the probate court the power to apprentice minors whose parents are living but who have not the means of maintaining their children, or willfully neglect to support and educate them. Under chapter 50, dealing with guardian and ward, the probate court is given the power to appoint guardians for minors, and may appoint a guardian of a minor, although the parents of such a child are living, and may appoint guardians for illegitimate children, and in its discretion may not only invest the guardian so appointed with the control of the property of such ward, but may give to the guardian the custody · of the ward.

Reverting to the adoption statute, it will be observed that under section 17 only the consent of the mother of an illegitimate child is required for its adoption. The statute not recognizing any right in the father of an illegitimate child in case of adoption, the question then to be solved is, was he entitled to notice of the adoption proceeding independent of statute? We believe it to be universally conceded that the parents have no property right in their children. The right which they have is a natural right, but in all cases the state is parens patriae to the child, and it has power to, by legislation, control the right of the child to inherit, to take it from its parents, and give it into the custody of others, to determine what is for the best interests of the child, and that which will promote the welfare of the state. In other words, the will of the state in such matters is supreme, and in all such cases the legislature may prescribe what notice, if any, shall be given to the parents of the child to be affected by the contemplated change of its status.

(2,3)  As the parents have no property right in the child, its custody may be given to others, even without the consent of the parents, and without notice to them.

Purinton v. Jamrock, 195 Mass. 187, 80 N. E. 802, 18 L. R. A. (N. S.) 926. In the case cited the court said:

"Nor have the parents any inherent right of property in their minor child of which they can in no way be deprived without their consent. They are the natural guardians of their child, entitled to its custody, with the right to appropriate its earnings, and may recover damages for any interference with their rights by a wrongdoer. Horgan v. Pacific Mills, 158 Mass. 402, 35 Am. St. Rep. 504, 33 N. E. 581. But this right is not an absolute and uncontrollable one. It will not be enforced to the detriment or destruction of the happiness and well-being of the child. See the strong opinion of Brewer, J., in Chapsky v. Wood, 26 Kan. 650, 40 Am. Rep. 321. The same doctrine is laid down in Clark v. Bayer, 32 Ohio St. 299, 310, 30 Am. Rep. 593. As the child owes allegiance to the government of the country of its birth, so it is entitled to the protection of that government, which must consult its welfare, comfort, and interest in regulating its custody during its minoriy. Mercein v. People, 25 Wend. (N .Y.) 64, 103, 35 Am. Dec. 653; United States v. Green, 3 Mason, 482, 485, Fed. Cas. No. 15,256. The right of the parents is not an absolute right of property, but is in the nature of a trust reposed in them, and is subject to their correlative duty to care for and protect the child; and the law secures their right only so long as they shall discharge their obligation. Nugent v. Powell, supra (4 Wyo. 173, 33 Pac. 23, 20 L. R. A. 199, 62 Am. St. Rep. 17); Gishwiler v. Dodez, 4 Ohio St. 615; Ex parte Crouse, 4 Whart. 9, 11."

In a note to the case of Allison v. Bryan (Okl.) 30 L. R. A. (N. S.) 146, the editor of the note says:

"It is frequently provided by statute that the consent of natural parents need not be obtained or notice given them of proceedings to adopt a child whom they have abandoned, or who has been taken from them by some judicial proceeding on the ground of improper guardianship or other similar ground. In such cases the existence of the fact authorizing the adoption is jurisdictional, and the court has jurisdiction of the proceeding on the finding by it of the existence of this fact, whether based upon proper evidence or not; and the judgment or order of adoption entered therein is conclusive, at least as to the parties to the proceedings and those claiming through or under them."

Cited in support of the text are the following cases: Re Camp, 131 Cal. 470, 63 Pac. 736, 82 Am. St. Rep. 371; Re McKeag's Estate, 141 Cal. 403, 74 Pac. 1039, 99 Am. St. Rep. 80; Leonard v. Honisfager, 43 Ind. App. 607, 88 N. E. 91; Egoff v. Madison County, 170 Ind. 238, 84 N. E. 151; Dupre's Succession, 116 La. 1091, 41 South, 324:

Re Edds, 137 Mass. 346; Tiffany v. Wright, 79 Neb. 10, 112 N. W. 311; Re Larson, 31 Hun, 539; Von Beck v. Thomsen, 44 App. Div. 373, 60 N. Y. Supp. 1094, affirmed without opinion in 167 N. Y. 601, 60 N. E. 1121; Parsons v. Parsons, 101 Wis. 76, 77 N. W. 147, 70 Am. St. Rep. 894; Nugent v. Powell, 4 Wyo. 173, 33 Pac. 23, 20 L. R. A. 199, 62 Am. St. Rep. 17.

In many instances it would be fatal to the welfare of the child to hunt up the parents and give notice to them of the contemplated adoption proceedings. Take the case of abandoned children of parents who become so degraded that they willingly profit on the ruination of their children. They abandon the child, and some responsible, perhaps wealthy, married couple desire to adopt the child. The parents of the child appear and resist the proceedings, or remain silent, and knowing where the child is located, in after years harass the child and its adopted parents. All will agree that where parents abandon their children and leave them a charge upon the community, they have forever forfeited all right to the custody of such child; that in such case it is far better for the child and the state that it be given into the keeping of some one who will bestow upon such child the care, love and affection which it cannot receive from its own unnatural parents, and that in the future the child should never know the parents who gave it birth, and then failed to discharge their parental duty.

That the adoption proceedings undertaken by the respondents herein was valid and binding as to them, and not subject to collateral attack by the parties thereto or their privies, is well settled. See the note to the case of Beatty v. Davenport (Wash.) 13 Ann. Cas. 585. Here, then, we have a decree of adoption valid as between the parties, namely, the adopted children and the respondents, which respondents cannot impeach collaterally. Under our statute the parents of a legitimate child could of course attack the decree or contract of adoption collaterally, if entered or agreed to without their consent, where such parents had never abandoned their child; but this right would exist in such parents

only becausee the statute requires their consent, unless the child has been abandoned. The same is true of the mother of an illegitimate child; but does the putative father of an illegitimate child have this right? He is not such a father as is recognized under the law of this state. Only in one instance is there any mention of his rights in regard to his illegitimate children, and that is under section 1850, which gives such children the right to inherit from their father whenever they have been recognized by him as his children, but such recognition must have been generally notorious or else in writing; and in such event they inherit from the father only when he has no legitimate children. But in no instance under the statute is he charged with any duty toward such children or with any liability for their support and maintenance. Nor can he be required under any statute of this state to support and maintain such children.

It would be a strange doctrine that would give to a man the custody of a child without casting upon him the correlative duty of supporting the child. It is the duty to support and maintain the child that gives to the father and mother the right to the custody of the child and to its earnings during minority. If petitioner is correct in his contention here, he would be entitled to the custody of the child without a correlative duty to support, and that as against an adopting parent upon whom the law casts an absolute duty to support.

Petitioner contends that the following citations show that the putative father of a bastard is entitled to the custody of the child over every other person except the mother. 3 R. C. L. Bastards, § 23; Aycock v. Hampton, 65 L. R. A. 689, note; Appeal of Pote, 106 Pa. 574, 51 Am. Rep. 540; Allison v. Bryan, 21 Okl. 557, 97 Pac. 282, 18 L. R. A. (N. S.) 931, 17 Ann. Cas. 468, 2 Am. & Eng. Enc. of Law, 142; 7 C. J. Bastards, § 29; Barela v. Roberts, 34 Tex. 554. Other cases will be found in the note to the case of Aycock v. Hampton, 65 L. R. A. 693, which hold that a reputed father is entitled to the custody of the bastard child as against all persons ex-

cept the mother; but a reading of the cases cited will show that in each instance the decision is influenced by some statutory provision. The English cases cited give the reputed father the right to the custody of the child because, under various British statutes regulating the care and maintenance of the poor of the different parishes, the father of the illegitimate child may be required to give bond for the support of such child; and it being the duty of the father to support the child, the courts there hold that, as against every one except the mother, he is entitled to the custody of the child; but we believe this right to the custody there rests solely upon the duty imposed upon the father to support the child, and in all American cases cited it will be found that statutes casting a like duty upon the father influenced the decision of the court. This is shown by the following quotation from Kent's Commentaries, vol. 2, p. 215:

"The mother or reputed father is generally in this country chargeable by law with the maintenance of the bastard child: and in New York it is in such way as any two justices of the peace of the county shall think meet; and the goods, chattels, and real estate of the parents are seizable for the support of such children, if the parents have absconded. The reputed father is liable to arrest and imprisonment until he gives security to indemnify the town chargeable with the maintenance of the child. (a) These provisions are intended for the public indemnity, and were borrowed from the several English statutes on the subject; and similar regulations to coerce the putative father to maintain the child, and indemnify the town or parish, have been adopted in the several states."

(4) At common law a bastard was looked upon as the son of nobody, and sometimes was called "filius nullius," and sometimes "filius populi," a child of the people, having no father, and being incapable of inheriting, nor could he have heirs but of his own body.

Under section 1850, Code 1915, in this state illegitimate children are permitted to inherit from their mother. If we assume that at common law the putative father of a bastard would be entitled to the custody of the child as against every one except the mother, it would by no means follow that such father would be here entitled to

the custody of the child as against an adopting parent. Under the common law, as we have seen, such a child has no relatives, could not inherit, and that no one could inherit from it except the heirs of its body. The rights of the mother to the custody of the child eliminated, it may probably be held that the right to its custody was a contest only between strangers, and that as between such the natural right of the putative father would receive recognition. But there is no reason for the recognition of such natural right, where the child has parents by adoption, in every way qualified to raise the child, and able financially to give it a good education and fit it to discharge its duty to the state as a citizen. In such a case it is not a contest between strangers, in no way legally related to the child. It is a contest between a putative father on one side, not legally related to the child, and upon whom no enforceable duty rests, to care for the child under the law of this state, and on the other the adopted father, legally related to the child, and upon whom rests the duty to support and educate. Under our statutes here notice to the putative father is not required, nor is his consent to the adoption essential. That the adoption of a bastard child can be had without such notice to, or consent of, the father was decided by the Supreme Court of Massachusetts in the case of Gibson, Appellant, 154 Mass. 378, 28 N. E. 296.

Thus the question for determination is as to the right to the custody of the child as between the putative father and the adopting parents. Every consideration of public policy and the welfare of the child demands that the child remain with the adopting parents. Under our statute (section 22, Code 1915) the adopted child inherits from its parents, and it is the policy of the law here that children should have the benefit of a parental home, where a legal duty rests upon some responsible person to rear, educate, and care for the child. Upon the respondents in this case, under the adoption proceeding, this duty rests. If the child should be given to the putative father no responsibility under our law rests upon him to continue to care for, educate, and

Ex parte Wallace, 26 N. M. 181.

maintain the child   No unqualified legal right would exist in the child to inherit from him, and he might take the children today and abandon them tomorrow, and no law exists under which he could be punished therefor. Every consideration looking to the welfare of the children in this case would seemingly require that they remain in the custody of the respondents.   As the putative father, under our statute, is not entitled to notice, it follows that he has no right to question the validity of the adoption proceedings.   In 12 R. C. L. p. 1230, it is said:

"As a general rule, a person applying for a writ to secure the release of another must show some interest in such person or some authorization to make the application; and a mere stranger or volunteer, in no way entitled to the custody of or responsible for the welfare of, an infant, nor invited by the infant, its parents or guardian, to sue out a writ, has no right to its issuance."

It would unsettle the status of many adopted children in this state were this court to give its approval to the contention of petitioner.   It is a matter of common knowledge that many illegitimate children have been placed in good homes in this state   and   have   been adopted by people who have learned to love them as their own.   The welfare of such children and the happiness of their adopted parents certainly require and demand that such relation be not subject to attack by one who, under the statute, is not required to be consulted or notified of the adoption proceeding.   To so hold would place a weapon in the hand of some scoundrel by which he could extort blood money from people who were undertaking to discharge a duty to the child which he did not have the manhood to undertake.   If notice to him was essential, in order to bind him, and absent such he would be entitled to reclaim the child upon the death of the mother, then he could demand the child from the adopting parents after they had become so attached to the child that their love could not be measured by earthly possessions.   It is better for the state and for the children that he have no such right, and we so hold.

From what has been said it follows that the court was in error in awarding the custody of the children to the

petitioner. The case will therefore be reversed, with instructions to the district court to set aside its judgment and restore the custody of the children to the respondents, and it is so ordered.

PARKER, C. J., and RAYNOLDS, J., concur.

On Motion for Rehearing.

ROBERTS, J.   On motion for rehearing new counsel appear for appellee and challenge the correctness of the former opinion in this case upon numerous grounds, supported by a very able and elaborate brief. We deem it necessary to notice only two points made in the motion and brief, being content as to the others with the former opinion.

(5) It is called to our attention that section 1850, referred to in the opinion, providing when illegitimate children may inherit from the father, was amended by chapter 69, Laws 1915, so that now such children would inherit, the other statutory conditions appearing, although there were legitimate children. This is the only effect the amendment has bearing in any manner upon this case. But it does not cast upon the putative father the duty to support, care for, and educate such children during their minority. The statute in question only has to do with the right of inheritance, and its existence or nonexistence would not change the rights of the parties in this case in so far as the custody of the children is concerned.

(6) The second point to be noticed is the contention that the poor laws of England, under which the putative father was required to support his bastard child, became by our adoption of the common law, a part of our law. This admitted, and there would be a basis for the contention that the putative father was entitled to the custody of the bastard child. But these poor laws were local to England, and no state, so far as we are aware, has ever held that by the adoption of the common law such poor laws were introduced into the adopting state.

The former opinion will be adhered to, and the motion for rehearing denied; and it is so ordered.

PARKER, C. J., and RAYNOLDS, J., concur.